**Nos. 23-5950**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

IN RE NISSAN NORTH AMERICA, INC.

LITIGATION,

———————

Appeal from the United States District Court
Middle District of Tennessee, Nashville Division
Hon. William L. Campbell, Jr.
Case Nos. 19-cv-843, 19-cv-854, and 22-cv-98

## *AMICUS CURIAE* BRIEF OF THE
## ALLIANCE FOR AUTOMOTIVE INNOVATION
## IN SUPPORT OF DEFENDANTS-APPELLANTS

Philip S. Goldberg
Christopher E. Appel
SHOOK, HARDY & BACON L.L.P.
1800 K Street NW, Suite 1000
Washington, D.C. 20006
(202) 783-8400
pgoldberg@shb.com
cappel@shb.com

Dated: February 2, 2024

*Attorneys for Amicus Curiae*

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

**Sixth Circuit Case Numbers:** 23-5950

**Case Name:** In re Nissan North America, Inc. Litigation

**Name of counsel:** Philip S. Goldberg

*Amicus* Alliance for Automotive Innovation makes the following disclosure:

1.  Is *amicus* a subsidiary or affiliate of a publicly owned corporation?

    No.

2.  Is there a publicly owned corporation, not a party to the appeal or an *amicus*, that has a financial interest in the outcome?

    None known.

                    s/ Philip S. Goldberg_____
                    PHILIP S. GOLDBERG
                    Shook Hardy & Bacon L.L.P.
                    1800 K Street, NW, Suite 1000
                    Washington, DC 20006

                    *Counsel of Record for Amicus*
                    *Alliance for Automotive Innovation*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................ ii

INTEREST OF *AMICUS CURIAE* ............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................2

ARGUMENT ........................................................................................5

I.   FALSE ACTIVATIONS OF AEB SYSTEMS ARE UNAVOIDABLE
     ASPECTS OF PREVENTING HARM, NOT SIGNS OF DEFECT ...............5

     A.   Automobile Manufacturers Have Been Working Closely with NHTSA
          for Decades to Study, Deploy and Enhance AEB Systems ......................7

     B.   NHTSA Has Recognized that False Positives Are Inherent to AEB
          Technology Even as Manufacturers Work to Reduce Them ...................10

II.  THE COURT SHOULD REQUIRE PLAINTIFFS TO PROVIDE
     EVIDENCE OF A COMMON DEFECT BEFORE A DISTRICT
     COURT CAN CERTIFY A DEFECT-BASED CLASS ACTION.................14

III. REQUIRING PROPER RULE 23 REVIEW WILL SAFEGUARD THE
     DEVELOPMENT OF NEW, BENEFICIAL SAFETY TECHNOLOGY ......17

CONCLUSION ....................................................................................21

CERTIFICATE OF COMPLIANCE.......................................................22

CERTIFICATE OF SERVICE ...............................................................23

# TABLE OF AUTHORITIES

**CASES**                                                                     **PAGE**

*Am. Express Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013).......................14

*Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813 (7th Cir. 2010).......................15

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011).......................................16

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975)..............................16

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) .........................................................15

*Coopers & Lybrand v. Livesay* 437 U.S. 463 (1978) ...............................................16

*Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861 (2000)....................................18

*In re Blood Reagents Antitrust Litig.*, 783 F.3d 183 (3rd Cir. 2015) ................ 15-16

*In re Ford Motor Co.*, 86 F.4th 723 (6th Cir. 2023)........................................15, 17

*In re Nissan No. Am., Inc. Litig.*, 2023 WL2749161
    (M.D. Tenn. Mar. 31, 2023) ............................................................................4

*Prantil v. Arkema Inc.*, 986 F.3d 570 (5th Cir. 2021).............................................16

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).......................................14, 15

**STATUTES AND REGULATIONS**

49 C.F.R. § 571.126 ........................................................................................................19

49 U.S.C. § 30129 ............................................................................................................9

**OTHER AUTHORITY**

Ganesh Kumar K. Ammannay, *Implantable Cardioverter Defibrillators –
    The Past, Present and Future*, Arch. Med. Sci. Atheroscler Dis.
    (July 2020) .................................................................................................20

Automatic Emergency Braking System (AEB) Research Report: An Update of the June 2012 Research Report Titled, "Forward-Looking Advanced Braking Technologies Research Report," NHTSA (Aug. 2014), *available at* https://www.automotivesafetycouncil.org/ wp-content/uploads/2017/01/NHTSA-AEB-Report.pdf ...............................8

Shubhangi Bhatia, *How ESC Serves as a Building Block for Vehicle Safety Tech of the Future*, ETAuto, May 23, 2023, at https://auto.economictimes.indiatimes.com/news/auto-technology/how-esc-serves-as-a-building-block-for-vehicle-safety-tech-of-the-future/100520223 .......................................................................19

Jessica B. Cicchino, *Effectiveness of Forward Collision Warning and Autonomous Emergency Braking Systems in Reducing Front-to-rear Crash Rates*, Accident Analysis & Prevention, Vol. 99, Part A (Feb. 2017) ........................................................................................13

Jessica B. Cicchino, *Effects of Automatic Emergency Braking Systems on Pedestrian Crash Risk*, Accident Analysis & Prevention, Vol. 172 (July 2022) ........................................................................................13

Vicki Contie, *Implanted Defibrillators Boost "Real World" Survival*, NIH Research Matters, Jan. 14, 2013 ............................................................20

Driver Assistance Technologies, Collision Intervention, Automatic Emergency Braking, NHTSA, at https://www.nhtsa.gov/vehicle-safety/driver-assistance-technologies#technologies-explained-collision-intervention .......................................................................5

Final Rule, Federal Motor Vehicle Safety Standards; Electronic Stability Control Systems; Controls and Displays, 72 Fed. Reg. 17236 (Apr. 6, 2007) ........................................................................................19

Garrick J. Forkenbrock & Bryan C. O'Harra, "A Forward Collision Warning (FCW) Program Evaluation," Paper No. 09–0561, Proceedings of the 21st International Technical Conference for the Enhanced Safety of Vehicles (2009) ........................................................ 7-8

Lawrence L. Hershman, *The U.S. New Car Assessment Program (NCAP): Past, Present and Future*, NHTSA, Paper No. 390, *available at* https://www-nrd.nhtsa.dot.gov/pdf/esv/esv17/Proceed/00245.pdf .........................................................................18

Russ Mitchell, *The (Near) Future of Driving: Cars that Watch You Watch Them Steer*, L.A. Times, Apr. 29, 2021, at https://www.latimes.com/business/story/2021-04-29/driver-monitoring-tech-self-driving .......................................................20

Notice of Proposed Rulemaking, Federal Motor Vehicle Safety Standards: Automatic Emergency Braking Systems for Light Vehicles, RIN 2127-AM37, Dept. of Transp., 88 Fed. Reg. 38632 (June 13, 2023) ...................................................................................*passim*

Notice of Proposed Rulemaking, Heavy Vehicle Automatic Emergency Braking; AEB Test Devices, RIN 2127-AM36, Dept. of Transp., 88 Fed. Reg. 43174 (July 6, 2023) ...................................................10, 12, 13

Pedestrian Automatic Emergency Brake System Confirmation Test (Working Draft), NHTSA (Apr. 2019), *available at* https://www.regulations.gov/document/NHTSA-2019-0102-0005 ...............8

John R. Quain, *Eyes on the Road! (Your Car Is Watching)*, N.Y. Times, Mar. 28, 2019, at https://www.nytimes.com/2019/03/28/business/autonomous-cars-technology-privacy.html ........................................... 19-20

*Study Shows Front Crash Prevention Works for Large Trucks Too*, IIHS – Highway Loss Data Inst., Sept. 3, 2020, at https://www.iihs.org/news/detail/study-shows-front-crash-prevention-works-for-large-trucks-too .........................................................13

*The Significance of Progress: Implications of the Diversity and Complexity of ADAS for Road Safety and the Insurance Landscape*, Veoneer & Swiss Re (2021), *available at* https://www.veoneer.com/sites/default/files/Veoneer_Swiss%20Re_Whitepaper_2021.pdf ............................................................ 6-7

Traffic Safety Facts 2021: A Compilation of Motor Vehicle Crash Data, NHTSA (Dec. 2023), *available at* https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/813527 .............................................................5

Christian Wardlaw, *Automatic Emergency Braking: How It Works*,
Kelley Blue Book, May 19, 2013, at https://www.kbb.com/
car-advice/how-does-automatic-emergency-braking-
work/#:~:text=Depending%20on%20the%20system's%20design,y
ou'll%20avoid%20a%20collision.........................................................6, 8, 10

G.H. van Welsenes, et al., *Improvements in 25 Years of Implantable
Cardioverter Defibrillator Therapy*, Neth Heart J. (Jan. 2011), *at*
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3021193/.................... 20-21

*Amicus curiae*, Alliance for Automotive Innovation ("Auto Innovators"), submits this brief because of the adverse impact on safety the ruling below will have if class actions can be certified without having to show that an actual defect exists in a device that can prevent harm, and that defect is common to the class.

Formed in 2020 and headquartered in Washington, DC, Auto Innovators' members include the U.S. operations of automakers that produce and sell nearly 98% of all new cars and light trucks sold in the United States, as well as original equipment suppliers, technology and other automotive-related companies, and other trade associations.[2]

Auto Innovators' mission is to improve the environment and motor vehicle safety through developing global standards and market-based, cost-effective solutions to meet emerging challenges associated with manufacturing automobiles. The development of automatic emergency braking systems, and their deployment

---

[1] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. The parties have consented to the filing of this brief.

[2] Auto Innovators' members include: Aisin, Aptiv, Autoliv, BASF, the BMW Group, Bosch, Cruise, Denso, Envision AESC, Ferrari, Ford, General Motors, Ghost Autonomy, Harman, Honda, Hyundai, infineon, Isuzu, Jaguar Land Rover, Karma, Kia, LG, Luminar, Magna, Mazda, McLaren, Mercedes-Benz, Mitsubishi Motors, Nissan, Nuro, Panasonic, Porsche, Qualcomm, the RV Industry Association, Samsung SDI, SiriusXM, Stellantis, Subaru, Texas Instruments, Toyota, Uber, Vinfast, Volkswagen, and Volvo.

across nearly all automaker makes and models, has been a successful initiative and has become critical to crash avoidance and saving lives. Allowing a class to be certified based on false positives—not actual defect—would stunt this technology.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This putative class action provides a stark example of speculative litigation that could impede important progress on life-saving innovations. This litigation involves Automatic Emergency Braking (AEB) systems, which are sophisticated systems with multiple sensors, sub-systems and software working together to detect when a vehicle is close to crashing. It then alerts the driver and/or applies the vehicle's brakes in an effort to avoid the crash. Under industry initiatives, AEB and pedestrian AEB (PAEB) systems have become integral to driver and pedestrian protection, demonstrating very high levels of safety benefits under their current capabilities. The National Highway Traffic Safety Administration (NHTSA) recently estimated in a proposed rulemaking that, as the technology improves and becomes standard in more vehicles, every year hundreds of additional lives can be saved and tens of thousands of injuries can be avoided.

With devices that can prevent harm, the perfect must not be the enemy of the good. As NHTSA and auto manufacturers have understood, AEB systems will not be 100% perfect when, *and only when*, a collision is imminent. But, it is better to put this technology into vehicles, assess real-time data, and improve accuracy over

time. Even today, AEB cannot avoid all accidents. And, as pertinent here, there will be times an AEB system will activate when not needed. As Defendant explains, the owners' manuals for Plaintiffs' vehicles state their AEB system "may unexpectedly apply partial braking" and drivers should "depress the accelerator pedal to override the system" when needed. Def. Br. at 7. Comparable instructions are common in the industry. Therefore, merely asserting AEB false activations occur is not indicative of a defect in an AEB system. It is an expected outcome.

Here, Plaintiffs are trying to turn the occasional false positive—where their AEB systems allegedly applied brakes when not needed—into a class action. They have not sustained any physical harm and assert only speculative economic loss theories. Further, these theories all center on proof of defect, but Plaintiffs have not identified any actual defect in any AEB product, let alone a defect common among all of the class members' various versions of Defendant's AEB systems needed for class certification. *See* Def's Brief at 13 (quoting Plaintiffs' expert as admitting, "I don't know what [the] specific defect is").

Nevertheless, the district court certified the class. In doing so, it conflated false activations with product defect. Plaintiffs never put forth any theory, including through expert testimony, as to how these products are *defective*. Defects do not speak for themselves. The court also misapplied Rule 23, stating class actions can be certified so long as plaintiffs raise "common questions," even when

they have not and cannot show that resolving those questions involve common issues of fact. *In re Nissan No. Am., Inc. Litig.*, 2023 WL2749161, at *4 (M.D. Tenn. Mar. 31, 2023). Here, the allegations involve different classes of sensors, different configurations, and different software versions—more than 30 combinations in all. The court sidestepped these distinctions, finding that requiring Plaintiffs to provide factual support for their Rule 23 requirements is "rooted in a level of specificity simply not required at the certification stage." *Id.* This statement is legal error.

*Amicus* respectfully request that this Court correct this ruling and make clear that courts cannot certify defect-based class actions unless they determine there is scientific evidence of an actual defect, and that specific defect is common to the proposed class. Otherwise, the lower court's ruling will fuel a novel trend in class litigation where counsel raise speculative economic loss theories by invoking product liability *concepts* without showing a defect actually exists. As this case demonstrates, automobiles are complex machines and the industry is at the doorstep of technology, such as AEB systems, that can significantly curtail injuries and deaths. Certifying classes over non-defective products based on the expected learning and development process will improperly obstruct these innovations.

# ARGUMENT

## I. FALSE ACTIVATIONS OF AEB SYSTEMS ARE UNAVOIDABLE ASPECTS OF PREVENTING HARM, NOT SIGNS OF DEFECT

AEB systems have become essential to mitigating America's "crash problem." Notice of Proposed Rulemaking, Federal Motor Vehicle Safety Standards: Automatic Emergency Braking Systems for Light Vehicles, RIN 2127-AM37, Dept. of Transp., 88 Fed. Reg. 38632, 38633 (June 13, 2023) [hereafter "Proposed AEB Rule"]. According to the most recent statistics, which are for 2021, there were 42,939 traffic crash fatalities that year, including 7,388 pedestrians, and nearly 2.5 million traffic crash injuries. *See* Traffic Safety Facts 2021: A Compilation of Motor Vehicle Crash Data, NHTSA (Dec. 2023), at ii.[3]

AEB systems include crash imminent braking (CIB) and dynamic brake support (DBS) technologies; together they "reduce moderate and less severe rear-end crashes that are common on our roadways." Driver Assistance Technologies, Collision Intervention, Automatic Emergency Braking, NHTSA.[4] For instance, if an AEB-equipped vehicle detects a potential crash, CIB can automatically apply a vehicle's brakes if the driver does not brake, and DBS can automatically supplement a driver's crash avoidance if the driver does not brake hard enough.

---

[3] https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/813527

[4] https://www.nhtsa.gov/vehicle-safety/driver-assistance-technologies#technologies-explained-collision-intervention

*See id.* These systems rely on increasingly sophisticated cameras, radar, and multiple sensors to detect objects and pedestrians in a vehicle's path. *See* Christian Wardlaw, *Automatic Emergency Braking: How It Works*, Kelley Blue Book, May 19, 2013[5]; *see also* Proposed AEB Rule, 88 Fed. Reg. at 38633 (discussing "emerging systems that use lidar and thermal sensors"). They often work with other systems, including forward-collision warning (FCW), to alert a driver in addition to applying a vehicle's brakes. As NHTSA recognizes, these life-saving technologies are the product of "extensive research" efforts, both on the part of the automakers and federal government. Proposed AEB Rule, 88 Fed. Reg. at 38644.

An unavoidable part of developing this type of technology is a learning curve. AEB systems cannot be perfected in a laboratory. They need real-world data from the wide variety of ways in which the technology can be triggered. These devices remain in a continual state of trial and refinement. That an advanced driver assist feature produces an occasional false positive—for example, an unnecessary lane-assist alert or the applying of AEB in a non-crash situation—is not indicative of a product defect; it is necessary for progress. *Cf. The Significance of Progress: Implications of the Diversity and Complexity of ADAS for Road Safety and the*

---

[5] https://www.kbb.com/car-advice/how-does-automatic-emergency-braking-work/#:~:text=Depending%20on%20the%20system's%20design,you'll%20avoid%20a%20collision

*Insurance Landscape*, Veoneer & Swiss Re (2021), at 5[6] (explaining that "a one-size-fits-all approach to AEB is probably not what the future holds for increasing the safety benefits of these systems"). Given their complexities, many safety systems, including AEB systems, require exhaustive testing, validation, and verification to facilitate continual improvement.

### A. Automobile Manufacturers Have Been Working Closely with NHTSA for Decades to Study, Deploy and Enhance AEB Systems

The research for AEB systems dates back to the 1990s with the development of FCW systems that alert drivers to potential accidents; AEB systems prevent or mitigate those accidents. *See* Proposed AEB Rule, 88 Fed. Reg. at 38644. The auto industry, working with NHTSA, identified "specific crash types that an FCW system could be designed to address, the resulting minimum functional requirements, and potential objective test procedures for evaluation." *Id.* at 38644, 38645. By the late 1990s, further study and field-testing identified common vehicle crash test avoidance scenarios to effectively deploy FCW systems to avoid crashes in those situations. *See id.* at 38645. The continual research into FCW systems facilitated the initial research on AEB systems. *See, e.g.,* Garrick J. Forkenbrock & Bryan C. O'Harra, "A Forward Collision Warning (FCW) Program Evaluation,"

---

[6] https://www.veoneer.com/sites/default/files/Veoneer_Swiss%20Re_Whitepaper_2021.pdf

Paper No. 09–0561, Proceedings of the 21st International Technical Conference for the Enhanced Safety of Vehicles (2009).

In 2010, the industry worked with NHTSA on testing AEB systems as part of the New Car Assessment Program (NCAP), and the agency initiated research on PAEB systems shortly thereafter. AEB, which focuses on avoiding rear-end crashes with a lead vehicle, and PAEB systems, where individuals enter the roadway from various places, present different technological and evaluative challenges. *See* Proposed AEB Rule, 88 Fed. Reg. at 38634. For example, PAEB systems "tend not to be as effective in the dark." Wardlaw, *Automatic Emergency Braking: How It Works*, *supra*. During the next few years, NHTSA developed testing measures and standards through data collected from commercially available CIB and DBS systems. *See id.* at 38645.[7] The agency also used "production vehicles equipped with PAEB systems" to evaluate adult and child pedestrians at walking and running speeds. *Id.* at 38646.[8] In 2015, NHTSA added CIB and DBS technologies to its NCAP, with assessments of these AEB systems to begin in

---

[7]   *See also* Automatic Emergency Braking System (AEB) Research Report: An Update of the June 2012 Research Report Titled, "Forward-Looking Advanced Braking Technologies Research Report," NHTSA (Aug. 2014), at 3-5, *available at* https://www.automotivesafetycouncil.org/wp-content/uploads/2017/01/NHTSA-AEB-Report.pdf (discussing agency research and industry collaboration efforts).

[8]   *See also* Pedestrian Automatic Emergency Brake System Confirmation Test (Working Draft), NHTSA (Apr. 2019), *available at* https://www.regulations.gov/document/NHTSA-2019-0102-0005 (discussing various PAEB tests).

model year 2018. *See id.* "The AEB performance tests consisted of test scenarios and test speeds that were derived from crash statistics, field operational tests, and NHTSA testing experience, including experience gained from development of the FCW performance tests already in [the] NCAP." *Id.*

The automobile industry's collaborative efforts continued to facilitate this progress. In 2016, twenty automakers representing more than 99% of the U.S. light vehicle market committed, in coordination with NHTSA and the Insurance Institute for Highway Safety (IIHS), to include lower speed AEB as a standard feature on new light duty cars and trucks by September 2022. *See id.* at 38648. These automakers also committed to making AEB systems standard on virtually all trucks under 10,000 pounds by September 2025. *See id.* at 38649. AEB systems have now "reached a level of maturity" sufficient to require inclusion in new vehicles, but that still does not mean the systems are perfect. *Id.* at 38634.

This progress is continuing. In the Infrastructure Investment and Jobs Act, Congress directed the Secretary of Transportation to promulgate minimum performance standards with respect to crash avoidance technology and to require that all passenger motor vehicles be equipped with FCW and AEB systems. *See* Pub. Law 117-58 (2021); 49 U.S.C. § 30129(a). In 2023, NHTSA proposed a rule requiring automakers to incorporate AEB systems in new passenger vehicles and light trucks to detect and react to an imminent rear-end crash with a lead vehicle or

collision with a pedestrian. *See* Proposed AEB Rule, 88 Fed. Reg. at 38635. The agency also proposed requiring "heavy vehicles" to include AEB systems to mitigate the frequency and severity of rear-end collisions with other vehicles. Notice of Proposed Rulemaking, Heavy Vehicle Automatic Emergency Braking; AEB Test Devices, RIN 2127-AM36, Dept. of Transp., 88 Fed. Reg. 43174 (July 6, 2023) [hereafter "Proposed Heavy Vehicle AEB Rule"].

Auto manufacturers, including through *Amicus* Auto Innovators, have been working with NHTSA on these rulemakings. In the next few years, there will likely be a generational shift in the underlying architecture in AEB technology that will include higher sensing range, processing capabilities, and system redundancies to ensure appropriate levels of functional safety are provided under more complex conditions. These advancements will also complement other innovative technologies similarly developed through iterative processes.

## B. NHTSA Has Recognized that False Positives Are Inherent to AEB Technology Even as Manufacturers Work to Reduce Them

This effort to equip all new cars, light trucks, and heavy vehicles with AEB systems is a recognition that AEB technology provides safety in the "aggregate"—not that all "shortcomings in the overall capability of AEB technology" have been eliminated. Proposed AEB Rule, 88 Fed. Reg. at 38676. "No advanced safety system is 100% foolproof." Wardlaw, *Automatic Emergency Braking: How It Works*, *supra*. With AEB systems, "false positives are usually harmless." *Id.*

Even under NHTSA's proposed rules, AEB systems are not measured on a scale of perfection, but whether they meet certain standards. For passenger vehicles and light trucks, an AEB system would need to: (1) provide the driver with a FCW; (2) apply brakes automatically at forward speeds greater than 10 km/h (6.2 mph); (3) satisfy test procedures for lead vehicle and pedestrian collisions, including daytime and darkness testing; and (4) detect system malfunctions and notify the driver of any malfunction that causes the AEB system not to meet the proposed performance requirements. *See* Proposed AEB Rule, 88 Fed. Reg. at 38635.

The agency's proposed testing procedures initially included false positive scenarios, including driving over a steel plate (*i.e.* "steel plate test"), driving between two parked vehicles (*i.e.* "pass through test") and pedestrian crossing scenarios. But, as NHTSA explains, these tests "are by no means comprehensive, nor sufficient to eliminate susceptibility to false activations." *Id.* at 38648, 38696-97. In fact, some of NHTSA's proposed requirements could *increase* the likelihood of false positives under real world conditions. In order to minimize false positives, an AEB system must have sufficient information upon which to base the decision to apply braking force. Where there are unpredictable movements in and around roadways, activation for crash avoidance may need to be triggered before the system can make a determination that the vehicle or pedestrian actually entered the

vehicle's path. If the AEB system activates early and the other vehicle or pedestrian reverses trajectory, the driver may perceive it to be a false activation.

For many of these reasons, NHTSA removed certain false activation tests in recent iterations of the rulemaking. The proposed track tests simply could not replicate the complex roadway and traffic environments that could lead to false activations. Further, auto manufacturers have been working continually to address false positive scenarios that may be reasonably encountered under real-world conditions. These false activations may arise because of limitations of specific versions of AEB systems, which are overcome through continued technological developments, or as a trade-off when increasing standards for ensuring activation at higher speeds or different scenarios. Real-time data collection, processing, and adjustments—as Nissan has done with its updated systems at issue here—are central to reducing these "false activations." *Id.* at 38696. Indeed, as NHTSA has recognized, manufacturers have been doing so "in the absence of specific requirements." Proposed Heavy Vehicle AEB Rule, 88 Fed. Reg. at 43217. But, expecting false activations to be eliminated completely is not realistic or feasible.

What's most important is that AEB systems "substantially decrease the safety problems associated with rear-end and pedestrian crashes." Proposed AEB Rule, 88 Fed. Reg. at 38635. IIHS estimates passenger vehicles equipped with FCW and AEB systems have reduced rear-end crashes by 50% and corresponding

injuries by 56%. *See Study Shows Front Crash Prevention Works for Large Trucks Too*, IIHS – Highway Loss Data Inst., Sept. 3, 2020[9]; *see also* Jessica B. Cicchino, *Effectiveness of Forward Collision Warning and Autonomous Emergency Braking Systems in Reducing Front-to-rear Crash Rates*, Accident Analysis & Prevention, Vol. 99, Part A, pp.142-52 (Feb. 2017). A 2022 IIHS study estimated PAEBs reduced pedestrian crashes 25% to 27% and injuries by 30%. *See* Jessica B. Cicchino, *Effects of Automatic Emergency Braking Systems on Pedestrian Crash Risk*, Accident Analysis & Prevention, Vol. 172, Art. 106686 (July 2022).

Looking ahead, NHTSA has estimated that including AEB systems in all passenger vehicles and light trucks will reduce fatalities by an additional 362 people annually, including 238 fewer pedestrian deaths, and reduce injuries by 24,321 annually, including 2,672 pedestrian injuries. *Id.* at 38635-36. The agency estimates the proposed rule for heavy vehicles will "prevent an estimated 19,118 crashes, save 155 lives, and reduce 8,814 non-fatal injuries annually." Proposed Heavy Vehicle AEB Rule, 88 Fed. Reg. at 43176.

In the case at bar, Plaintiffs allege Nissan's AEB systems had occasional false positives. Merely pointing out these situations does not make Nissan's AEB systems defective. As this history demonstrates, false positives are an expected part of developing AEB systems and other prophylactic safety devices.

---

[9] https://www.iihs.org/news/detail/study-shows-front-crash-prevention-works-for-large-trucks-too

## II. THE COURT SHOULD REQUIRE PLAINTIFFS TO PROVIDE EVIDENCE OF A COMMON DEFECT BEFORE A DISTRICT COURT CAN CERTIFY A DEFECT-BASED CLASS ACTION

The fundamental problem with the district court's ruling is that it never required Plaintiffs to provide evidence that the false positives in Nissan's AEB systems were the result of a defect and that any such defect was common among the various versions of AEB systems the class members owned. Rather, the court stated it certified the class because Plaintiffs asked "common questions" and that ensuring Plaintiffs have established evidence to support these theories was a merits question not appropriate at the class certification stage. The Supreme Court, though, has held that "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

The Supreme Court has stated on multiple occasions that Rule 23 is not "a mere pleading standard." *Id*. at 351. Rather, "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id*. at 350-51 (cleaned up). In practice, the Court noted, this rigorous review will "exclude most claims." *Am. Express Co. v. Italian Colors Restaurant*, 570 U.S. 228, 234 (2013). The Sixth Circuit has properly applied this jurisprudence, reiterating that class certification is "the exception, not the rule,"

and district courts "should not certify a class unless its 'rigorous analysis' shows that . . . all four Rule 23(a) prerequisites are met." *In re Ford Motor Co.*, 86 F.4th 723, 726 (6th Cir. 2023). Rule 23 is "a gatekeeper to class certification," and plaintiffs must provide "*evidentiary proof*" of each criterion. *Id*. (emphasis added).

Thus, contrary to the district court's ruling, the necessary rigorous analysis for class certification here required it to analyze the *evidence* underlying Plaintiffs' defect claims—even evidence related to the merits—because demonstrating a common defect among the multiple AEB systems at issue here was clearly relevant to the certification inquiry. "That this inquiry might overlap with the merits of the underlying claims 'cannot be helped." *Id*. at 729 (quoting *Wal-Mart*, 564 U.S. at 351). The district court erred by not hearing arguments bearing on "the propriety of class certification, simply because those arguments would also be pertinent to the merits determination." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

Here, as with other allegations of defect involving complex machinery, this rigorous review needed to include subjecting Plaintiffs' scientific testimony to Rule 702 standards at the certification stage—an approach a majority of the circuits have taken. *See, e.g.*, *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010) (when an expert's report "is critical to class certification, as it is here, a district court must . . . perform a full [Rule 702] analysis before certifying the class"); *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3rd

Cir. 2015) (such an assessment of the scientific assertions is part of the Supreme Court's requirement that "the class certification analysis must be 'rigorous'"). "[I]f any expert's opinion would not be admissible at trial, it should not pave the way for certifying a proposed class." *Prantil v. Arkema Inc.*, 986 F.3d 570, 576 (5th Cir. 2021). The failure of Plaintiffs' experts in this case to identify any actual or common defect should, at the very least, have precluded class certification. Such an outcome does not mean Defendant automatically wins on the merits. Each class member could argue its AEB system was defective in its own trial.

Requiring class-wide allegations to be properly examined at the certification stage serves an important purpose: it protects the courts and defendants from prolonged, expensive litigation, as well as abusive, *in terrorem* settlements driven by defendants' risk aversion, not justice. As the Supreme Court has observed, merely having to litigate a putative class action, regardless of the merits, "may so increase the defendant's potential damages liability and litigation costs that he may feel it economically prudent to settle and to abandon a meritorious defense." *Coopers & Lybrand v. Livesay* 437 U.S. 463, 476 (1978); *see also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 740 (1975); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011) (noting "risk of 'in terrorem' settlements that class actions entail"). The "exponential aggregation of claims and parties

magnifies the stakes of litigation and can thus have massive ramifications for plaintiffs and defendants alike." *In re Ford Motor Co.*, 86 F.4th at 726.

To be clear, class actions like this one, when certified without basic evidence of class-wide defect, do not provide "access to justice." They open the courthouse to unprincipled and potentially abusive litigation and settlement pressures. Before allowing class claims based on a product defect, the court must assess whether plaintiffs have met their Rule 23 burdens and, here, they have not.

## III. REQUIRING PROPER RULE 23 REVIEW WILL SAFEGUARD THE DEVELOPMENT OF NEW, BENEFICIAL SAFETY TECHNOLOGY

Proper application of Rule 23 in this case is particularly important because, in addition to AEB systems, the auto industry is in the midst of a generational shift in safety technology and the core elements that define a modern vehicle are continually evolving as new and exciting innovations enter the marketplace. With an increasing shift toward electrification, advanced driver assistance systems, enhanced drive interfaces, and vehicle connectivity features, there are major changes in vehicle architecture and software that can substantially reduce risks of harm. A successful driver assistance device is one where the benefits outweigh risks in many instances in which people would otherwise be harmed; it does not mean the product has to work perfectly. Indeed, the addition of safety technologies in cars has been a major success story over the past half-century, contributing to the reduction and mitigation of fatalities and injuries in automobile accidents.

Many safety features, like AEB systems, are initially optional and intentionally vary from each other so that companies can enhance their effectiveness, often working with and at the direction of federal regulators. The Supreme Court has appreciated this approach to safety, affirming that these devices should be encouraged even when not perfected. *See Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 875 (2000) (explaining the development of passive restraints, including airbags). In *Geier*, the Court, quoting from the Department of Transportation's brief, explained that experiences are sometimes needed to "overcome technical safety problems [and] encourage technological development," as well as lower costs. *Id*.

The New Car Assessment Program has long recognized the value of allowing vehicle safety measures to be continually enhanced over time. *See* Lawrence L. Hershman, *The U.S. New Car Assessment Program (NCAP): Past, Present and Future*, NHTSA, Paper No. 390[10] (stating NCAP's goal of encouraging "vehicle manufacturers to design higher levels of safety into their vehicles"). This federal program encourages car manufacturers to test, develop, and promote safety technologies at their initial stages and improve them through continued integration, safety testing, and data collection. *See id.*

---

[10] https://www-nrd.nhtsa.dot.gov/pdf/esv/esv17/Proceed/00245.pdf

As just one example, Electronic Stability Control (ESC) is a technology that can detect and reduce loss of traction. In 2006, only about 29% of passenger vehicles were equipped with ESC systems. *See* Final Rule, Federal Motor Vehicle Safety Standards; Electronic Stability Control Systems; Controls and Displays, 72 Fed. Reg. 17236, 17241 (Apr. 6, 2007). A government study concluded that ESC systems were *30% effective* in preventing fatal single-vehicle crashes for passenger cars. *See id.* at 17245. Yet, by 2010, about 85% of new vehicles had adopted ESC systems, and, in 2012, their inclusion became required by federal regulations for all passenger vehicles, trucks, and buses with a gross vehicle weight rating of 10,000 pounds or less. *See* 49 C.F.R. § 571.126.

The use of ESC has also led to newer technologies, including Roll Stability Control (RSC) to reduce the risk of rollovers, hill-hold assist to prevent roll-back from a stopped position on an incline, and other Advanced Driver Assistance Systems (ADAS) functions. *See* Shubhangi Bhatia, *How ESC Serves as a Building Block for Vehicle Safety Tech of the Future*, ETAuto, May 23, 2023.[11] Automakers are also developing infrared sensors and cameras to sense eye movements to identify whether a driver's gaze is distracted or sleepy and employ countermeasures to re-focus or alert the driver. *See* John R. Quain, *Eyes on the*

---

[11] https://auto.economictimes.indiatimes.com/news/auto-technology/how-esc-serves-as-a-building-block-for-vehicle-safety-tech-of-the-future/100520223

*Road! (Your Car Is Watching)*, N.Y. Times, Mar. 28, 2019.[12] These technologies will be supplanted by fully self-driving cars. *See* Russ Mitchell, *The (Near) Future of Driving: Cars that Watch You Watch Them Steer*, L.A. Times, Apr. 29, 2021.[13]

Cars are not unique with respect to such advances. For example, an implantable defibrillator can prevent or mitigate harm that is otherwise going to occur; it delivers electric pulses to a heart to prevent sudden cardiac arrest if its sensors detect dangerous rhythms. *See* Ganesh Kumar K. Ammannay, *Implantable Cardioverter Defibrillators – The Past, Present and Future*, Arch. Med. Sci. Atheroscler Dis. (July 2020).[14] The technology for implantable defibrillators has improved while they have been in use such that these devices "are indispensable today in successfully managing fatal ventricular arrhythmias." *Id.*; *see also* Vicki Contie, *Implanted Defibrillators Boost "Real World" Survival*, NIH Research Matters, Jan. 14, 2013. Since implantable defibrillators were first introduced in the 1980s and 1990s, the devices last longer, work with greater accuracy, and can be implanted without open-heart surgery. *See* G.H. van Welsenes, et al., *Improvements in 25 Years of Implantable Cardioverter Defibrillator Therapy*,

[12] https://www.nytimes.com/2019/03/28/business/autonomous-cars-technology-privacy.html

[13] https://www.latimes.com/business/story/2021-04-29/driver-monitoring-tech-self-driving

[14] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7433784/#

Neth Heart J. (Jan. 2011)[15]. Without the ability to learn from real-life experiences, these types of technological breakthroughs may not have been possible.

Certifying class actions based on the existence of false positives would create a standard for perfection not achievable for many important devices. Here, it is better to err on the side of ensuring AEB systems work when needed, even if doing so creates an occasional false positive. These false positives can be reduced over time as manufacturers learn from results and use their resources to continue researching and increasing the effectiveness, performance, and accuracy of their devices. They should not be the basis for unprincipled class liability.

## CONCLUSION

For these reasons, the Court should vacate and reverse the district court's order certifying the class actions below.

Respectfully submitted,

*/s/ Philip S. Goldberg*

Philip S. Goldberg
Christopher E. Appel
SHOOK, HARDY & BACON L.L.P.
1800 K Street, NW, Suite 1000
Washington, D.C. 20006
(202) 783-8400
pgoldberg@shb.com
cappel@shb.com

*Attorneys for Amicus Curiae*

Dated: February 2, 2024

---

[15] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3021193/

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 4,666 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Times New Roman 14-point proportional type.

*/s/ Philip S. Goldberg*

PHILIP S. GOLDBERG

February 2, 2024

## CERTIFICATE OF SERVICE

I hereby certify that the on this 2nd day of February 2024, I electronically filed the foregoing Brief with the Clerk of the Court using the CM/ECF system. I certify that service will be accomplished by the CM/ECF system for all participants in this case who are registered CM/ECF users.

/s/ Philip S. Goldberg

PHILIP S. GOLDBERG

February 2, 2024